**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 15-cr-00265-WJM

UNITED STATES OF AMERICA,

  Plaintiff,

v.

RONALD NEWSOM,

  Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART DENVER POLICE DEPARTMENT'S MOTION TO QUASH**

---

Before the Court is a Motion to Quash Subpoena *Duces Tecum*, or in the Alternative, Motion for *In Camera* Review and Protective Order ("Motion to Quash") filed by the Denver Police Department ("DPD"). (ECF No. 34.) For the reasons explained below, the Motion to Quash is granted in part and denied in part.

### I. BACKGROUND

The Government has indicted Defendant Ronald Newsom ("Newsom") for possession of a firearm by a prohibited person. (ECF No. 1.) Newsom filed a Motion to Suppress, claiming that the evidence of his possession of a firearm was obtained in violation of the Fourth Amendment. (ECF No. 20.) That Motion, the Government's Response (ECF No. 22), and Newsom's Reply (ECF No. 24), have revealed a stark factual dispute, as described below.

**A.** **Newsom's Story**

Newsom says he was in the parking lot of the Airway Motel on West Colfax in

Denver at about 5:30 p.m. on May 5, 2015.  (ECF No. 20 ¶¶ 1–2, 6.)  A small group of people had gathered in the Motel parking lot and were engaged in a nonphysical confrontation, but began to disperse when two DPD officers, Damon Bowser ("Bowser") and Joseph Portillo ("Portillo"), approached.  (*Id.* ¶¶ 2, 4; ECF No. 24 at 2.)  The officers spoke with the Motel manager, Ms. Jeon Keum, who informed them "that an unknown female (hereinafter 'unknown female') was trespassing and pointed the unknown female out to the officers."  (ECF No. 20 ¶ 5.)

Bowser and Portillo then "observed the unknown female being escorted away from the motel by Mr. Newsom, a hotel guest who was assisting the manager in removing the unknown female from the premises.  The unknown female was yelling obscenities as she was being escorted away."  (*Id.* ¶ 6.)  Newsom was not pushing this female but was "walking with her and guiding her away" from the Motel.  (ECF No. 24 at 4.)

Bowser and Portillo approached Newsom and the unknown female and ordered both to put their hands behind their backs.  (ECF No. 20 ¶¶ 7–8.)  "Mr. Newsom responded that he had done nothing wrong and he did not want to have any contact with the officers.  Mr. Newsom attempted to walk away."  (*Id.* ¶ 9.)  The officers, however, "surrounded Mr. Newsom, continuing to order him to put his hands behind his back," which Newsom did.  (*Id.* ¶¶ 10–11.)

Bowser and Portillo then "grabbed" Newsom, searched his pants pocket, and discovered and removed a gun.  (*Id.* ¶¶ 12–13.)  Bowser and Portillo next "took Mr. Newsom to the ground," "placed him in handcuffs," and continued to search his

person, "result[ing] in the recovery of additional contraband." (*Id.* ¶¶ 13–14.) "Shortly after his detention and seizure/arrest, Mr. Newsom was transported to the Denver Detention Center where he made incriminating statements." (*Id.* ¶ 15.)

**B.    The Government's Story**

Relying on Bowser's and Portillo's accounts, the Government tells a different story.  Bowser and Portillo say that they were on routine patrol when they "saw a large group of individuals in a physical altercation" in the parking lot of the Airway Motel. (ECF No. 22 ¶ 3.)  The officers

> exited their patrol vehicles in order to intervene in the physical altercation and stop the fighting.  The officers observed a black male, later identified as [Newsom], wearing a gray long sleeve shirt and black jeans pushing an unidentified black female west along the sidewalk.  The female was yelling obscenities as [Newsom] was pushing her.  Due to [Newsom's] aggressive physical actions with the female, Officer Portillo focused his attention on him.

(*Id.* ¶ 4.)

Bowser and Portillo "approached [Newsom] and gave him commands to stop pushing the female." (*Id.*)  At this point, Newsom "directed his belligerence toward the officers and walked toward [them], becoming verbally hostile toward them." (*Id.* ¶ 5.)  In addition, "[a]s [Newsom] approached the officers in this manner, he kept putting his hands in his front pockets.  Given [his] volatile behavior, the officers feared for their safety and believed that he was attempting to hide a weapon or narcotics." (*Id.*)  Portillo therefore "ordered [Newsom] to take his hand out of his pockets." (*Id.*)

Newsom "continued to ignore the officers' lawful commands and began to walk away from the officers." (*Id.* ¶ 6.)  "At this time, the officers wanted to conduct a *Terry*

frisk of [Newsom] because they feared that he had weapons on his person." (*Id.*) Newsom "continued to ignore the officers' commands, but did briefly put his hands behind his back," upon which Portillo

> was able to get control of [Newsom] and conduct[] a *Terry* frisk for weapons. As Officer Portillo had control of [Newsom's] arms, he noticed that [Newsom] began to scan the area as if looking for a possible escape route. In [Newsom's] rear pant pocket was an item which Officer Portillo immediately recognized as a firearm due to its weight and outline. Officer Portillo removed the firearm from [Newsom's] pocket. Once the firearm was secured by Officer Portillo, [Newsom] lunged forward with all of his body weight in an attempt to escape Officer Portillo's grasp. Corporal Bowser had to assist Officer Portillo in regaining control of [Newsom] and they were able to put him into custody.

(*Id.*)

With Newsom in custody, Portillo searched his person and located a small plastic baggie of suspected crack cocaine in one of Newsom's pockets. (*Id.* ¶ 7.) Portillo then spoke with the Motel manager who stated that "she had been having issues with one of the black females involved in the altercation and that she wanted this female off of her property." (*Id.* ¶ 8.) However, this female fled the scene while the officers were engaged with Newsom, and she remains unidentified. (*Id.*)

Newsom was later transported to the Denver Detention Center, advised of his *Miranda* rights, waived those rights, and then "admitted to buying and possessing the firearm and to possessing the narcotics." (*Id.* ¶ 7.)

C.   **The Subpoena and Motion to Quash**

Given the parties' conflicting accounts, the Court set an evidentiary hearing.

(ECF No. 25.)  In preparation for that hearing, Newsom issued a Federal Rule of Criminal Procedure 17(c) subpoena to DPD, requesting "[a]ny and all information known to the Denver Police Department, including but not limited to, reports, complaints, citations, write-ups, and/or record of investigations, related to official misconduct, dishonesty, and/or excessive force used by [Bowser or Portillo]."  (ECF No. 34 at 2–3.)  DPD moved to quash that subpoena (*see id.*), leading to the present dispute.

## II.  LEGAL STANDARD

The Court has wide discretion to determine whether a Rule 17(c) subpoena is appropriate.  The trial court is in the best position to "view the witness or evidence and assess credibility and probative value."  *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986).  The Court's decision is reviewed for abuse of discretion and will be reversed only if the reviewing court has "a definite and firm conviction that the court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."  *United States v. Gonzales-Acosta*, 989 F.2d 384, 388–89 (10th Cir. 1993).

The parties dispute the substantive legal standard for issuance of a subpoena pursuant to Rule 17(c).  DPD and the Government (*see* ECF No. 34 at 3; ECF No. 37 ¶ 4) contend that the rule announced by the Supreme Court in *United States v. Nixon*, 418 U.S. 683 (1974), applies:

> Under this test, in order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due

>  diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*Id.* at 699–700. The Supreme Court in *Nixon* further distilled these requirements into a three-part, three-word test: "(1) relevancy; (2) admissibility; (3) specificity." *Id.* at 700.

Newsom suggests that the *Nixon* test does not apply here because the subpoenas are issued to a third party rather than to the Government. (ECF No. 39 at 3–4.) One court has held that "[a] real question remains as to whether it makes sense to require a defendant's use of Rule 17(c) to obtain material from a non-party to meet this same standard." *United States v. Nachamie*, 91 F. Supp. 2d 552, 562 (S.D.N.Y. 2000). The basis for this different standard is that, unlike the Government, the defendant has not had an earlier opportunity to obtain material by means of a grand jury subpoena. Because the Rule states only that a court may quash a subpoena "if compliance would be unreasonable or oppressive," the judicial gloss that the material sought must be evidentiary—defined as relevant, admissible, and specific—may be inappropriate in the context of a defense subpoena of documents from third parties. As one court has noted,

> The notion that because Rule 16 provides for discovery, Rule 17(c) has no role in the discovery of documents can, of course, only apply to documents in the government's hands; accordingly, Rule 17(c) may well be a proper device for discovering documents in the hands of third parties.

*United States v. Tomison*, 969 F. Supp. 587, 593 n.14 (E.D. Cal. 1997). Newsom therefore advocates that the only test for obtaining the documents should be whether

the subpoena is reasonable and not unduly oppressive to the producing party. (ECF No. 39 at 3–4.)

When faced with this same question more than four years ago, the undersigned found it unnecessary to answer it because the outcome would have been the same either way. *See United States v. Neal*, 2011 WL 3648381, at *1–2 (D. Colo. Aug. 18, 2011). Answering the question is not as easy to avoid this time around because, as described below, the Court has found that Newsom's subpoena, in part, fails under the *Nixon* standard—meaning that the difference between that standard and the looser standards offered in cases such as *Nachamie* and *Tomison* might make a difference in this case.

Here, however, the Court finds that Newsom has effectively conceded his inability to satisfy the looser standard. Specifically, Newsom's only argument under the looser standard's "not unduly oppressive" requirement is that he has proposed a plan by which this Court, through *in camera* inspection of certain summary documents discussed further below, could narrow the subpoena. (ECF No. 39 at 4.) In other words, Newsom is unwilling to defend the subpoena, as written, against the charge of undue oppression. The Court therefore finds that the looser subpoena standard, to the extent it might apply, has not been satisfied in this case. Accordingly, the Court will analyze Newsom's subpoena under the *Nixon* standard.

### III.  ANALYSIS

A.  **Availability of Other Witnesses**

Before turning to the *Nixon* analysis itself, the Court considers DPD's argument

that Newsom's case differs from that described in *Neal*, *supra*, because the only witnesses to the allegedly unconstitutional seizure in *Neal* were the defendant and the police officer who made the seizure. (ECF No. 34 at 4–5.) Here, by contrast, there were various other individuals at the Motel whom Newsom could call to testify. (*Id.*)

Availability of other potential evidence is not part of the short-form *Nixon* standard (relevant, admissible, and specific), but the Supreme Court's longer version does speak of the effect on the defendant's ability to "properly prepare for trial without such production." *Nixon*, 418 U.S. at 699. DPD argues that Newsom can adequately prepare through these other potential witnesses. (ECF No. 34 at 5.)

Circumstances may exist where other available evidence is more than enough, thereby rendering a specific subpoena "unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). The record is not sufficient for the Court to conclude that this is one of those circumstances. In particular, the "unknown female" would seem to be one of the most important witnesses and yet no party knows who she was. For at least this reason, the Court finds that Newsom's ability to prepare for the suppression hearing would be impeded if the Court held that Bowser's and Portillo's internal DPD files were entirely off-limits. Accordingly, the Court will address the *Nixon* factors.

B.     **Relevance & Specificity**

The first prong of the *Nixon* standard requires the Court to assess whether Newsom seeks relevant documents, meaning those that have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. In

these circumstances, the Court finds that this inquiry overlaps with *Nixon*'s third prong—the specificity inquiry—which "is designed to prevent the defense from using the Rule 17(c) subpoena as a 'fishing expedition.'" *Neal*, 2011 WL 3648381, at *4.

It appears that the forthcoming suppression hearing will turn on whether Newsom was peacefully walking the unknown female away from the Motel, or whether he was pushing her away and acting belligerently toward Bowser and Portillo, including through allegedly suspicious motions such as placing his hands in his pockets. These two accounts obviously conflict, and therefore Bowser's and Portillo's credibility will be an important factor in determining which version to accept. And indeed, that is precisely why Newsom issued the subpoena, *i.e.*, in hopes of obtaining documents that could impeach the officers' credibility. (ECF No. 39 at 2, 4–5.)

In that light, Newsom's request for documents regarding complaints of and investigations into "official misconduct, dishonesty, and/or excessive force" (ECF No. 34 at 2–3) arguably seeks relevant information, but is also arguably overbroad. For example, simple complaints of excessive force may have nothing necessarily to do with how Bowser or Portillo perceived Newsom's actions at the Motel.

However, the Court need not conduct this analysis in the abstract. In considering the Motion to Quash, the Court required DPD to produce *in camera* certain summary documents known as "officer resumes." (ECF No. 40.) These resumes briefly describe the nature and disposition of every complaint lodged with DPD's Internal Affairs Bureau against Bowser or Portillo. The Court reviewed the resumes for anything remotely suggesting the sorts of documents Newsom seeks. (ECF No. 34 at 2–3.) The Court then ordered DPD to produce *in camera* the totality of specific

investigation files.  (ECF No. 41.)  The Court reviewed those files for anything of conceivable impeachment value with respect to the points actually in dispute.  The Court concluded that Portillo's files contain no such information.  As for Bowser, one file, viewed generously in Newsom's favor, contains potential impeachment material.[1]  The Court accordingly finds the information in that file relevant and the rest of the Court's analysis will focus on that one file ("Relevant File").

## C.     Admissibility

No party makes any arguments specific to admissibility.  Moreover, the Rules of Evidence are generally not self-executing, so it is not this Court's place to evaluate all potential evidentiary objections.  The Court accordingly finds the Relevant File admissible for purposes of the *Nixon* analysis, but the parties preserve any admissibility objections they might make at the forthcoming suppression hearing.

## D.     Bowser's Privacy Interests

DPD also moves to quash because production of the materials in the personnel files would violate Bowser's privacy interests.  (ECF No. 34 at 6–8.)  The Colorado Supreme Court has recognized that police officers have a right to privacy in their personnel files.  *See People v. Spykstra*, 234 P.3d 662, 670 (Colo. 2010).  Thus, in Colorado, a defendant must "make a greater showing of need and, in fact, might not gain access to otherwise material information depending on the nature of the interest against disclosure."  *Id.*

---

[1] Because of Bowser's privacy interests and the parties' agreement on a protective order (*see* Part III.D, *infra*), the Court will not further describe this file.

For two reasons, no detailed analysis of Bowser's privacy interests is required in this case. First, the Court has already reviewed Bowser's Internal Affairs files *in camera* and determined that only one file satisfies the *Nixon* standard. Thus, Bowser's investigation files will not be subject to any party's or the public's general perusal.

Second, Newsom, the Government, and DPD have all agreed on a proposed protective order that would apply if the Court orders any disclosure. (*See* ECF No. 34 at 8–9; ECF No. 34-1; ECF No. 37 ¶ 4; ECF No. 39 at 7.) This proposed order restricts access to the parties (save for Newsom himself), counsel of record, and counsel's staff as needed. The Court will add to that proposed order a statement that Bowser may request that the courtroom be sealed during any testimony in which the Relevant File may come up. However, the Court will not exclude Newsom from the courtroom during such testimony.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. DPD's Motion to Quash (ECF No. 34) is GRANTED IN PART and DENIED IN PART. No later than **November 10, 2015**, DPD shall produce file number P2009-03066 to counsel for Newsom and the Government. This production shall be subject to a protective order that will be filed separately from this order;

2. DPD shall contact the undersigned's chambers to arrange a time to reclaim the documents it produced *in camera*; and

3. An evidentiary hearing on Defendant's Motion to Suppress Evidence (ECF No. 20) is hereby SET for **November 17, 2015 at 9:00 a.m.** Counsel are directed to

Section V of this Court's Revised Practice Standards regarding Courtroom Procedures and Deadlines applicable to contested hearings.

Dated this 4th day of November, 2015.

BY THE COURT:

William J. Martinez
United States District Judge